692 A.2d 51

NEW JERSEY MANUFACTURERS, PLAINTIFF–RESPONDENT, v. DANIEL D. O'CONNELL, DEFENDANT–APPELLANT, AND ANN HARPOOTLIAN, JIM CURLEY PONTIAC–GMC TRUCK, ITT HARTFORD, PARKWAY INSURANCE COMPANY (SERVICED BY MATERIAL DAMAGE ADJUSTMENT NEW JERSEY), DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued March 11, 1997—Decided April 3, 1997.

1

Before Judges MICHELS, MUIR, Jr., and COBURN.

*Joel L. Pitman* argued the cause for appellant (*Pitman, Pitman* and *Mindas,* Attorneys; *Mr. Pitman* and *Edward H. Lee,* on the brief).

*Brian G. Steller* argued the cause for respondent NJM (*Connell, Foley & Geiser,* attorneys; *Mr. Steller,* on the brief).

*Thomas Haluszczak, Jr.,* argued the cause for respondent ITT Hartford (*Henry S. Buchanan,* attorney; *Mr. Haluszczak,* on the brief).

The opinion of the court was delivered by

MUIR, Jr., J.A.D.

On this appeal, we are called upon to resolve the effect *Aubrey v. Harleysville Ins. Co.,* 140 *N.J.* 397, 658 *A.*2d 1246 (1995), has on a preexisting agreement between an injured non-owner driver of an automobile and a UIM insurer for the owner where the owner's policy provides greater UIM liability coverage than the driver's policy. Prior to the decision in *Aubrey* and in reliance on *Landi v. Gray,* 228 *N.J.Super.* 619, 550 *A.*2d 768 (App.Div.1988), which *Aubrey* overruled, New Jersey Manufacturers (NJM), the UIM insurer for the owner of the vehicle in which the non-owner driver, Daniel O'Connell, sustained injuries, agreed to arbitrate O'Connell's UIM claims for damages arising from injuries he sustained in a two-car accident with an alleged third-party tortfeasor.

Before arbitration commenced, but after the parties satisfied the other terms of their agreement, NJM, relying on *Aubrey,* filed this declaratory judgment. In its complaint, it alternatively contended the agreement either should be rescinded on mistake of law grounds or should be modified to limit O'Connell's UIM damage recovery claim to the lower liability limits of his automobile insurance policy with Parkway Insurance Company.

On stipulated facts, the trial court rejected the mistake of law-rescission contention but modified the agreement limiting the arbitration to the liability limits of O'Connell's policy. O'Connell appeals from the ensuing judgment.

We conclude the trial court properly rejected the mistake of law-rescission contention, an issue not challenged on appeal. However, we further conclude that, because the agreement was neither unconscionable nor against public policy, the contract cannot be modified by *Aubrey.* We hold that, unless a contract provides otherwise, the laws in existence at the time and place of making of the contract control, and subsequent decisional law changes are not part of the contract. Accordingly, we conclude the pre-*Aubrey* agreement between NJM and O'Connell is valid and enforceable according to its terms. We affirm the trial court's order to the extent it sustains the enforcement of the agreement but modify it to the extent it directs the pending arbitration be controlled by *Aubrey.*

## I.

The facts are stipulated. On January 13, 1994, O'Connell was seriously injured in a two-car automobile accident with Ann Harpootlian, the driver of the second car. The accident occurred while O'Connell was road testing a 1987 GMC truck for his employer, Jim Curley Pontiac–GMC Truck. State Leasing Corporation owned the truck and had leased it to Hovson's Incorporated.

At the time of the accident, O'Connell carried automobile insurance for his personal vehicle through Parkway Insurance Compa-

ny. His policy provided $300,000 in UIM coverage. Curley Pontiac had insurance, but it provided no UIM coverage to its employees. NJM insured the GMC with Hovson's a named insured. The NJM policy provided $1 million UIM coverage. Hartford Insurance Company insured the alleged tortfeasor, Harpootlian, under a policy with $250,000 liability limits.

On April 27, 1995, Hartford offered O'Connell the full amount of Harpootlian's coverage in return for a release of his claims against Harpootlian. O'Connell's counsel then advised NJM in writing of the offer to settle and O'Connell's intention to accept the offer. *See Longworth v. Van Houten*, 223 *N.J.Super.* 174, 538 *A.*2d 414 (App.Div.1988). In pertinent part, the letter provided:

> I know that you are aware that your options are to either permit Mr. O'Connell to accept the third party offer [of Hartford], in which case any right of subrogation [NJM] has will be extinguished or in the alternative, [NJM] may pay the $250,-000.00 to Mr. O'Connell in return for his right to subrogate to his rights against Harpootlian and Hartford.

On that same date, a similar letter was sent to Parkway Insurance.

On May 25, 1995, O'Connell's counsel had a telephone conversation with Christine McGrath, a NJM claims representative. During that conversation, McGrath indicated that NJM did not wish O'Connell to settle with Harpootlian, as NJM would assume the obligation to pay the $250,000 offered by Hartford and subrogate against Hartford and its insured. McGrath asked O'Connell's counsel to prepare a Release and Trust Agreement to that effect and noted that O'Connell's claim for UIM benefits from NJM would remain open. NJM also directed counsel to prepare and file a complaint against Harpootlian with the intention that NJM would subsequently be substituted as plaintiff. NJM further advised O'Connell's counsel that it, through its discussions with Parkway Insurance, determined that NJM's UIM coverage of O'Connell was primary and Parkway's coverage was secondary. Following this conversation, NJM forwarded a proposed Release and Trust Agreement and Lien Payment Guarantee form to be

signed by O'Connell. In return, O'Connell's counsel sent a proposed complaint seeking compensatory damages from Harpootlian.

On June 8, 1995, O'Connell's counsel returned the signed Release and Trust Agreement and a Lien Payment Guarantee to NJM. On that same date, the New Jersey Supreme Court decided *Aubrey.*

On June 9, 1995, O'Connell advised Hartford Insurance that he would not be settling with their insured as NJM opted to pay the $250,000 in exchange for O'Connell's subrogation of his rights.

On June 20, 1995, counsel for O'Connell received a check for $250,000 from NJM payable to O'Connell and his attorneys. That check was deposited in an attorney trust account and, a short time thereafter, disbursed to O'Connell.

In November 1995, NJM's attorney contacted O'Connell's attorney advising that NJM intended to deny the UIM claim based on the *Aubrey* decision. NJM's subsequent filing of this action led to the judgment under appeal. The trial court's decision is reflected by the judgment:

> 1. The agreement entered into by NJM and O'Connell is not rescinded and therefore O'Connell does not have to return the $250,000 to NJM.
>
> 2. The court orders that subsequent arbitration is governed by the recent decision of *Aubrey....*
>
> The agreement between plaintiff, NJM, and defendant, O'Connell, will stand as to the $250,000 payment. However, under the existing law, defendant, Parkway, must assume their obligations under their UIM coverage. Parkway will reimburse NJM for the $250,000 already paid to O'Connell and NJM will then assign their subrogation rights against Harpootlian and ITT Hartford to Parkway. Parkway and O'Connell will then proceed to arbitration with the policy limits of $300,000 minus the $250,000 already paid to O'Connell.

## II.

■ We begin by noting that, although a significant portion of the parties' arguments addressed the issue of *Aubrey*'s retroactivity, we find it unnecessary to address any substantive aspect of *Aubrey*'s holding. We resolve this case on basic principles of contract law.

■ The agreement here had the attributes of a settlement of potential litigation. Like the settlement of pending litigation, such an agreement ranks high in our public policy. *See Nolan v. Lee Ho,* 120 *N.J.* 465, 472, 577 *A.*2d 143 (1990). Absent compelling circumstances, settlement agreements are enforced by our courts. *Ibid.*

■ Settlements are contracts. *See Pascarella v. Bruck,* 190 *N.J.Super.* 118, 124, 462 *A.*2d 186 (App.Div.), *certif. denied,* 94 *N.J.* 600, 468 *A.*2d 233 (1983). Consequently, general principles of contract law apply. One of those common law principles is that a contract, valid at its inception, is not invalidated or eviscerated by a subsequent change in decisional or statutory law. *See Florida E. Coast Ry. Co. v. CSX Transp., Inc.,* 42 *F.*3d 1125, 1129–30 (7th Cir.1994); *Sutton v. Subaru of Am., Inc.,* 771 *F.Supp.* 321, 323 (D.Kan.1991); *Essex Group, Inc. v. Nill,* 594 *N.E.*2d 503, 507 (Ind.Ct.App.1992); *Huskission v. Sentry Ins.,* 123 *A.D.*2d 832, 507 *N.Y.S.*2d 447, 449 (1986); *First Nat'l Bank of Pa. v. Flanagan,* 515 Pa. 263, 528 *A.*2d 134, 137 (1987); *Second Fed. Sav. & Loan Ass'n v. Brennan,* 409 Pa.Super. 581, 598 *A.*2d 997, 999 (1991); *Pollard v. Steffens,* 161 Tex. 594, 343 *S.W.*2d 234, 238 (1961); *Romero v. State,* 893 *S.W.*2d 550, 553 (Tex.Ct.App.1995), *aff'd,* 927 *S.W.*2d 632 (Tex.1996); *see generally* 17A *C.J.S. Contracts* § 330. The rationale underlying the premise is that the original terms of a contract incorporate the relevant law at the time the contract is made. *Cf. Saffore v. Atlantic Cas. Ins. Co.,* 21 *N.J.* 300, 310, 121 *A.*2d 543 (1956); *Silverstein v. Keane,* 19 *N.J.* 1, 13, 115 *A.*2d 1 (1955); *Board of Educ. of the Tp. of Willingboro v. Employees Ass'n of Willingboro Sch.,* 178 *N.J.Super.* 477, 480, 429 *A.*2d 429 (App.Div.1981). Consequently, the contract should not be disturbed by subsequent changes in the law. The rationale is also premised on the principle that a party cannot unilaterally modify a material provision of a contract. A party is bound to the contract it made at the time, even if it turns out to be a poor deal. That the arbitration had not been resolved does not change its agreed-to and partially performed terms. Both fact and law in this

instance preclude a superimposition of *Aubrey*'s holding on the agreement.

■ Nonetheless, NJM argues equity dictates the agreement be modified consonant with *Aubrey*'s holding. Pointing to the retroactive nature of the *Aubrey* holding, NJM claims equity supports the trial court's ruling. We disagree in this instance. *Compare New Jersey Mfr.'s Ins. Co. v. Breen*, 297 *N.J.Super.* 503, 688 *A.*2d 647 (App.Div.1997).

■ Equity has long denied the relief NJM seeks. When parties formulate a contract based on existing decisional law, neither the decisions of courts of last resort which set aside prior decisions nor errant decisions of lower courts corrected on appeal afford a ground in equity for relieving a party to a contract from the prejudicial effect of reliance on those decisions in absence of fraud, misrepresentation, or want of knowledge of all the facts. 3 *Pomeroy's Equity Jurisprudence* § 850a (5th ed. 1941); *see also Nilsson v. Krueger*, 69 *S.D.* 312, 9 *N.W.*2d 783, 787 (1943); *Pollard, supra,* 343 *S.W.*2d at 238; *Romero, supra,* 893 *S.W.*2d at 553; 17 *C.J.S. Contracts* § 145. Given the absence of fraud, misrepresentation, or lack of knowledge of the facts in the agreement formulated here, we conclude equity does not afford NJM the relief sought.

In sum, we hold that, when a contract is legal at the time of its formation, a subsequent change in decisional law will not affect the contract's validity or enforceability as agreed upon by the parties. The judgment under appeal is accordingly modified consonant with this opinion, and the matter is remanded so the parties may proceed with arbitration under the NJM policy with its UIM liability limits.

Affirmed as modified.